Ted RIAL, Clarence Wells, Nancy Myers, William Cook, The Lone Sassafras Cemetery Association, Roger Boykin, Ronald Boykin, and Kathy Boykin *v.* Betty BOYKIN, Individually and as Guardian of Anthony Boykin

CA 05-995                                        237 S.W.3d 489

Court of Appeals of Arkansas
Opinion delivered June 21, 2006

*John F. Gibson, Jr.*, for appellants.

*Johnson Law Office, LLC*, by: *B. Kenneth Johnson*, for appellee.

ANDREE LAYTON ROAF, Judge. This appeal concerns a dispute over fifteen grave sites located in the Lone Sassafras Cemetery in Drew County. The trial court ruled that appellee Betty Boykin owned the sites, having purchased them for $100 apiece in 2001 and 2004. Appellants Ted Rial, Clarence Wells, Nancy Myers, and William Cook, who are members of the Lone Sassafras Cemetery Association Board, and appellants Roger, Ronald, and Kathy Boykin, who assert ownership of the sites, appeal and argue that the trial court erred in placing ownership in Betty. We agree, and we reverse and remand.

The ten-acre Lone Sassafras Cemetery has been in existence since approximately 1865, and it is managed by the Lone Sassafras Cemetery Association. Prior to 1999, those who wished to reserve burial spaces at the cemetery simply staked out the area that they wanted, free of charge. Appellants' witnesses testified that, in accordance with this informal practice, the late Franklin Boykin — brother of appellants Roger and Ronald — marked off a plot in the 1970s that was large enough to accommodate three rows of ten graves each. Franklin designated the area, which we will refer to hereafter as the Boykin plot, with crude markers, which were replaced in the mid-1990s by four corner stones bearing the letter "B."

Appellee Betty Boykin was married to Roger until 1976 and continued to live with him until 2000. In 1996 and 1997, the couple lost two sons in separate tragedies — Kerry as the result of a homicide, and Andy as the result of an automobile accident that also claimed the lives of his wife Susan and two of their children. Betty testified that, when Kerry died in 1996, Franklin insisted that he be buried in the Boykin plot. Eventually, all of the deceased were buried in three grave sites located in the middle of the plot.[1]

In 1999, the Cemetery Association Board began charging $100 per grave site in an effort to generate revenue. According to Betty, she wished to purchase grave sites for herself and her surviving grandchildren, including grandson Anthony Boykin, over whom she was guardian. In October 2001, she went to Elvin Funderberg, the secretary/treasurer of the Cemetery Association, and purchased nine sites adjacent to those where Kerry, Andy, and Susan were buried. Mr. Funderberg told Betty that he could not give her a deed to the sites, but he advised her to have a plat drawn up in order to pinpoint the sites' location in the cemetery. Betty then went to Chuck Dearman of the Stephenson-Dearman Funeral Home, who drew up a plat designating Kerry, Andy, and Susan's graves as numbers 3, 4, and 5, and designating the graves purchased by Betty as follows: numbers 1 and 2 to the left of those (that is, to the south); number 6 to the right of them; and numbers 7 through 12 directly below them. The plat contained the following language:

---

[1] Each of the young children killed in the automobile accident was buried with a parent, thus necessitating only three graves.

This is to certify that Betty Boykin and Anthony Boykin are the owners of the following grave spaces in Lone Sasafras [sic] Cemetery and that the grave spaces have been paid in full.

After the plat was prepared, Betty took it to Mr. Funderberg, who signed it and gave her a receipt.

On January 19, 2004, Betty purchased an additional six grave sites on the row directly above Sites 1 though 6. This sale was executed by Mary Funderberg, who was the Cemetery Association's secretary/treasurer at that time. Mrs. Funderberg drew up a plat that reflected all fifteen spaces that Betty had purchased and signed it as a "Cemetery Official." According to Betty, she was unaware of any markers around the spaces she purchased, and neither of the Funderbergs mentioned that anyone else held a claim to the spaces. However, Betty acknowledged that, around the time of her first son's death, Franklin told her he had designated "that side" of the cemetery for the Boykin family.

Sometime after her January 2004 purchase, Betty placed four corner posts around her sites. Thereafter, appellant Kathy Boykin (who was married to Ronald) discovered the markers and became upset. She claimed that Betty had not only bought specific sites that had been reserved for her and Ronald's family[2] but had acquired them in such a manner as to split the thirty-site Boykin plot in two, with some of the Boykin sites remaining to the south of Betty's purchases and others remaining on the north. When cemetery officials learned of the problem, they sent Betty a letter on April 20, 2004, telling her that all fifteen grave sites had been "purchased in error." According to the letter, "Franklin Boykin already designated nine of them for his family and Ronnie Boykin designated six of them for his family." The letter enclosed a $1500 refund and advised Betty to remove her corner posts within fifteen days. When she did not do so, the Association removed them.

On May 19, 2004, Betty filed suit, asking that she be declared the rightful owner of the disputed grave sites. A bench trial was held on December 1, 2004, and the above mentioned facts were established through the testimony of Betty and other mem-

---

[2] There was evidence that, at some point, Franklin encouraged Roger and Ronald to mark off the grave sites that they wanted in the Boykin plot. While Roger did not do so, witnesses testified that, prior to 1999, Ronald placed corner markers around ten sites on the bottom row, six of which were bought by Betty.

bers of the Boykin family. In addition, Board member Ted Rial testified concerning the operating procedures of the Cemetery Association. He admitted that the Association had few rules and had primarily been operated on the "honor system" as far as designating grave sites. When the Board voted in 1999 to begin charging $100 per site, the cemetery was not platted, so the Board continued to rely on the marking system. He said that, when Betty purchased her spaces, they had already been marked for the Boykin family and the Funderbergs should have gone to the cemetery to see if the sites were marked before selling them to Betty. Yet, Rial admitted that at the time of Betty's purchases, the Association had no written records showing that any other party had an interest in the grave sites. He further testified that, when the Funderbergs signed the certificates, they had "authority to sell [the grave sites] and authority to collect the pay."

Another Board member, Clarence Wells, testified that the selling of grave sites was not intended to terminate any claim already established by corner markers. Mary Funderberg testified, however, that, when the Board members voted to charge $100 per grave site, they did not discuss the effect that the procedure would have on the sites that had already been marked. Nevertheless, she said that she had asked Betty whether the sites Betty wanted to purchase were "owned, marked off, did anybody else have them and she said no."

Following the presentation of evidence, the trial judge found that, at the time the Association conveyed the fifteen grave sites to Betty, it held title to those sites and, thus, Betty legally purchased the sites. The judge also found that, in those instances where individuals had simply marked off grave sites, no money or title changed hands "and therefore ownership of the graves was not legally transferred." Appellants now appeal from that ruling.

When a case is tried by a circuit court sitting without a jury, the inquiry on appeal is whether the trial court's findings are clearly erroneous, or clearly against the preponderance of the evidence. *Brown v. Blake*, 86 Ark. App. 107, 161 S.W.3d 298 (2004). Recognition must be given to the trial judge's superior opportunity to determine credibility of witnesses and the weight to be given to their testimony. *Id.* However, a trial judge's conclusion of law is given no deference on appeal. *Allen v. Allen*, 82 Ark. App. 42, 110 S.W.3d 772 (2003).

Appellants make several arguments for reversal: 1) the transfer of the grave sites to Betty should have been by deed; 2) the plat

certificates given to Betty lacked the necessary conveyance language to transfer title; 3) the trial judge "departed from the rules and principles of equity" in stating that the only issue he had to decide was the "legal issue" of whether the Association owned the grave sites at the time it conveyed them; 4) the conveyances to Betty should have been canceled due to mutual mistake; 5) the Boykin family acquired an interest in the subject spaces prior to Betty's purchases. Because we agree with appellants' final point, we reverse and remand on that basis without addressing the other assignments of error.

As one commentator has recognized, the custom of setting aside individual places for burial may be traced to ancient times, and this long history "bespeaks the special protection that society has deemed appropriate for these final resting places." 2 *Powell on Real Property* § 18.02[1] at 18-43 (2005). The special consideration accorded burial plots requires that, in some respects, they not.be treated as subject to the laws of ordinary property. 14 AM. JUR. 2D *Cemeteries* § 31 (2d ed. 2000). In fact, it is generally recognized that the rights of a lot owner in a cemetery are contractual, 14 C.J.S. *Cemeteries* § 20 (2006), and that the interest acquired by the lot owner is considered a privilege, easement, or license. *Powell on Real Property*, *supra*, at § 18.02[2]; 14 C.J.S. *Cemeteries* § 21. Although Arkansas courts have not expressly ruled on the manner in which an interest may be established in a burial site, cases from other jurisdictions recognize as a general proposition that, when a family burial plot is established, it creates an easement against the fee and, while the naked legal title will pass, it passes subject to the easement created. *See Boyd v. Brabham*, 414 So. 2d 931 (Ala. 1982); *Aldridge v. Puckett*, 278 So. 2d 364 (Ala. 1973); *Walker v. Georgia Power Co.*, 339 S.E.2d 728 (Ga. App. 1986); *Heiligman v. Chambers*, 338 P.2d 144 (Okla. 1959); *In re Estate of Harding*, 878 A.2d 201 (Vt. 2005). Moreover, the easements and rights vested survive until the plot is abandoned by the person who established the plot or his heirs, or by the removal of buried bodies. *See Walker*, *supra*; *Estate of Harding*, *supra*. The *Walker* case also acknowledges that authority exists for the proposition that a place of burial may be established without written documentation.

■■ Based on the above, we believe the trial court erroneously concluded that Betty acquired ownership of the sites by virtue of having purchased them from the Association as legal title holder. There is ample evidence that Franklin Boykin and Ronald Boykin, prior to 1999, followed many years of custom and

usage and established a family burial plot in the Lone Sassafras Cemetery by placing markers around the plot area. And, although Betty denied any awareness of such markers, the trial court made no finding that the markers did not exist. Rather, the court concluded that the act of marking the plot created no interest in the Boykins because the act was not sufficient to pass legal title; and, by the same token, the court concluded that legal title was passed to Betty by virtue of the sale. However, this conclusion does not take into account that the Boykins acquired an easement, license, or privilege to use the burial sites via their clear, albeit informal, establishment of a family burial plot in accordance with the practices and procedures in effect at the time. Once that occurred, the Association, even if it still held legal title to the sites, could only convey an interest in them subject to the Boykins'. The practical effect is, despite the purported sale to Betty, the Boykin family members (and their heirs) who marked the sites retained the exclusive right to burial in them.

In light of the foregoing, we reverse and remand with directions to enter an order consistent with this opinion.

GLOVER and NEAL, JJ., agree.